## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANTHONY PAPARO,**<br><br>**v.**<br><br>**BOROUGH OF YEADON, SHARON COUNCIL-HARRIS, Individually and as PRESIDENT OF YEADON BOROUGH COUNCIL; LEARIN JOHNSON, Individually and as VICE PRESIDENT OF YEADON BOROUGH COUNCIL; TOMEKA JONES-WATERS, Individually and as PRESIDENT PRO TEMPORE OF YEADON BOROUGH COUNCIL, and CARLETTE BROOKS, Individually and as a Member of YEADON BOROUGH COUNCIL.** | **CIVIL ACTION**<br><br>**NO. 22-841** |

### MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT

**Baylson, J.**                                                          **February 2, 2024**

"Reverse discrimination" is a term frequently applied to instances of racial discrimination against persons who are not members of a racial minority. The Supreme Court long ago established that discrimination against a White person was as illegal as discrimination against a person in a racial minority. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 286-87 (1976). The Third Circuit has repeatedly followed this ruling. See Hicks v. ABT Assocs., Inc., 572 F.2d 960, 967 (3d Cir. 1978); Iadimarco v. Runyon, 190 F.3d 151, 154 (3d Cir. 1999); Stites v. Alan Ritchey, Inc., 458 F. App'x 110, 111 (3d Cir. 2012) (non-precedential); Williams v. Tech Mahindra (Americas) Inc, 70 F.4th 646 (3d Cir. 2023).

This case involves Plaintiff Anthony Paparo's claims of racial discrimination in connection with his termination as Chief of Police for the Borough of Yeadon. Paparo, who is White, served as the Borough's Chief of Police from January 2018 through his firing in February 2022. The

Borough has a population of approximately 11,600 residents, roughly 90% of whom are Black. Paparo's ousting was highly publicized, as the Philadelphia Inquirer contemporaneously reported on many of the same arguments the parties assert here.

Paparo brings this suit against the Borough itself and the four individual Borough Councilmembers who voted for his termination: Sharon Council-Harris, Learin Johnson, Tomeka Jones-Waters, and Carlette Brooks ("Individual Defendants," and together with the Borough, "Defendants").

Presently before this Court are (1) the Borough's Motion for Summary Judgment (ECF 48), (2) Individual Defendants' Motion for Summary Judgment (ECF 47), and (3) Paparo's Cross-Motion for Partial Summary Judgment (ECF 46). For the reasons explained below, each motion is **DENIED**.

## I.      FACTUAL BACKGROUND

### A.  Paparo's 2017 Hiring

On December 21, 2017, the Council for the Borough of Yeadon unanimously voted to hire Paparo as the Borough's Chief of Police. ECF No. 47-1 ¶¶ 2-3. Paparo was selected out of nine possible candidates, three of whom were Black. Id. at ¶ 3. Notably, four of the seven voting Councilmembers were also on the Council in February of 2022, when Paparo was eventually fired. Id. Those repeat players include Defendants Council-Harris, Jones-Waters, and Johnson, along with Councilmember LaToya Monroe, who is not a defendant in this case. Id.

### B.  Fraternal Order of Police Grievance

During Paparo's tenure, the Fraternal Order of Police ("FOP") filed a grievance against the Borough "on behalf of all full-time members of FOP's bargain unit." ECF 47-1 ¶ 5; ECF 55-1 ¶ 50. Specifically, on January 27, 2020, the FOP asserted the Collective Bargaining Agreement

("CBA") between the FOP and the Borough had permitted only limited use of part-time police officers—but that in 2019 and 2020—Paparo had employed part-time officers exceeding those limits.  ECF No. 47-1 ¶ 7; ECF 55-1 ¶ 50.

A lengthy negotiation process followed, and the Borough eventually settled via Consent Award in August 2021, agreeing to pay out $387,000 to full-time officers.  ECF No. 47-1 ¶¶ 10-11; ECF 47-4, Ex. R; ECF 55-1 ¶ 60.  Notably, Paparo contemporaneously voiced objections, contending the overtime allocation to part-time officers—which had been approved by Mayor Rohan Hepkins—was necessary to keep Borough residents safe during a time of civil unrest and COVID.  ECF 55-1 ¶¶ 53, 61-62.  Also relevant here, the Consent Award makes clear that it has "no precedential value or effect whatsoever with respect to any other set of facts or decisions," and expressly states that it "does not constitute an admission of any wrongdoing on the part of the Borough or any of its officers, agents, employees and/or representatives."  Id. at ¶¶ 64-65.

By contrast, in a June 2021 email from Paparo to Borough Officials, Paparo took "full responsibility for getting [the Borough] into this matter."  ECF 47-4, Ex. Q.

### C. Individual Defendants' Post-Primary Activities

In May 2021, Defendants Council-Harris, Johnson, and Brooks won the democratic primary for seats on Yeadon's Borough Council for the 2022 term.  ECF 47-1 ¶ 24; ECF 55-1 ¶ 8. According to Paparo, shortly after this win, Individual Defendants (including then-incumbent Defendant Jones-Waters) began discussing their intention to replace Paparo with a Black Chief of Police.  ECF 55-1 ¶¶ 21-22.  Further, Paparo contends a subset of the Individual Defendants began to approach other Borough Officials regarding this plan.[1]  Id.  Paparo's Counterstatement of Facts

---

[1] Defendants appear to concede this point, at least in part, as they note "Defendant Johnson and [Borough Finance Director Nafis Nicols] met at a lunch meeting in the spring or summer of 2021 and she referenced that she thought the Police Chief in the Borough should meet its demographics

provides the following summary table of testimonial and documentary evidence to support this

contention.  The Court describes the context surrounding this table immediately below.[2]

| Witness | Evidence |
|---|---|
| Mayor Rohan Hepkins | Defendant Johnson told Mayor Hepkins that the Individual Defendants planned to fire plaintiff Paparo because: "This is a Black town. We need a Black chief."[3] |
| Councilmember Liana Roadcloud | Defendant Johnson told Councilmember Roadcloud on multiple occasions that the Borough: "is a Black town; we deserve a Black chief." |
| Councilmember LaToya Monroe | Defendants Council-Harris, Johnson, and Jones-Waters all told Councilmember Monroe that: "Yeadon is a Black town that deserves a Black police chief." |
| Councilmember Nicole Beaty | Defendant Johnson told Councilmember Beaty that the Borough: "need[s] a Black chief" and that plaintiff Paparo "does not know how to talk to Black people."<br><br>In addition, Defendants Council-Harris and Jones-Waters also made comments to Councilmember Beaty that they wanted to replace plaintiff Paparo with a Black Chief of Police. |
| Finance Director Nafis Nichols | Defendant Johnson told Finance Director Nichols that the Borough: "needs a chief that represents the majority of the town, a black Chief." |
| Defendant Learin Johnson | Defendant Johnson admitted that she "said out loudly" before she was "sworn into office that she wondered if there was any consideration into firing plaintiff Paparo, and that she then asked "why did Yeadon not have a black chief?" |
| Defendant Carlette Brooks | Defendant Johnson told Defendant Brooks that the Borough: "should hire a black -- a police chief because Yeadon is 50-something percent black and what's wrong with having a black police chief." |

---

and the town should have a Chief that represents the majority of the town as in a black Chief."
ECF 47-1 ¶ 152.

[2] Defendants' Statements Undisputed of Facts likewise notes there was immediately friction between Individual Defendants and Paparo.  That said, they attribute this friction to other issues.  For example, Defendants note that Mayor Hepkins warned Paparo that the new Councilmembers "are going to do a lot of things in an effort try to dismantle and harm the police department." ECF 47-1 ¶ 25.  Likewise, in November of 2021, Defendant Jones-Waters allegedly "screamed at [Paparo] during a Council meeting about police manpower hours or issues."  Id. at ¶ 28 (emphasis added).

[3] The Borough's Statement of Facts similarly notes that in September 2021, Mayor Hepkins informed Paparo that "he had direct knowledge that [the Council was] going to remove [Paparo], that they wanted to replace [him] with a black Chief of Police."  ECF 48 ¶ 28.

| | Defendant Brooks also sent the following text message to Defendant Council-Harris: "Do you know the black police out here in Yeadon? That want the Police chief's job." |
|---|---|

ECF 55-1 at 6-7 (citations omitted).

### D. January 2nd Meetings

On the morning of January 2, 2022, Defendants Johnson and Brooks met with Councilmember Roadcloud and Councilmember-elect Beaty. ECF 55-1 ¶ 24. According to Roadcloud and Beaty, at that meeting, Defendant Johnson stated her intention to replace Paparo with a Black Chief of Police. Id. at ¶ 25.

Immediately afterwards, Roadcloud and Beaty then met with all four Individual Defendants. ECF 47-1 ¶ 186; ECF 55-1 ¶ 26, ECF 55-2, Ex. 5 at 15-16. At this subsequent meeting, at least some of the Individual Defendants reiterated their plan to terminate Paparo. ECF 55-1 ¶¶ 26-27. Further, evidence in record reflects that Defendant Jones-Waters conveyed her intention to reach out to Jonathan Josey, a Black police officer in Yeadon, and to ask Josey to "re-apply for the position."[4] Id. at ¶ 27; ECF 55-2, Ex. 10.

According to Roadcloud, she expressly advised Defendants Johnson and Brooks this course of action "was wrong" and that Individual Defendants should "stop saying it as it is discriminatory and illegal." ECF 55-2, Ex. 10. Nonetheless, that same evening, Defendant Brooks then sent a text message to Defendant Council-Harris asking: "Do you know the black police out here in Yeadon? That want the Police chief's job?" ECF 55-1 ¶ 29; ECF 47-1 ¶ 166.

---

[4] Individual Defendants frame the meeting differently, noting that Defendant Johnson "testified that on January 2, 2022, while meeting with other Councilmembers and future Councilmembers at Illusions, she was speaking aloud wondering why Yeadon did not have a black Police Chief," but that no one responded to this comment. ECF 47-1 ¶ 186.

### E.  January 3rd Calls and Discussions

The next morning, Defendant Johnson—allegedly at the direction of Defendant Council-Harris—called Detective Ferdie Ingram, who is Black and was a member of Yeadon's police department.  ECF 55-1 ¶¶ 30, 35.  On that call, Johnson purportedly told Ingram that Individual Defendants, once sworn in later that day, intended to fire Paparo and to offer Ingram the position, at least on a short-term basis.  Id. at ¶ 34.[5],[6]  Ingram declined, instead expressing support for Paparo.  Id. at ¶ 36.  Further, Ingram immediately informed Lieutenant Shawn Burns of the call, doing so for the purpose of Burns then informing Paparo.  Id.

The record further reflects that, this same morning, Defendant Johnson also told Mayor Hepkins that Individual Defendants intended to replace Paparo with Ingram.  Id. at ¶ 37.[7]

### F.  January 3rd Council Meeting

Individual Defendants were sworn in as Councilmembers that evening.  ECF 55-1 ¶ 39; ECF 47-1 ¶ 31.  Immediately before the meeting commenced, however, Paparo confronted Defendant Brooks about rumors that had begun percolating regarding his termination.  ECF 47-1 ¶ 32.  Per Paparo's deposition testimony, Paparo told Defendant Brooks he was "hearing [he was]

---

[5] According to Defendant Johnson, her "discussion with Ingram was whether or not he would be interested in three to six months while they did a nationwide search for a new Police Chief."  ECF 47-1 ¶ 191.

[6] Paparo further contends that Ingram was not "next in line" to be Yeadon's Chief of Police, as Ingram was "unqualified for the position because he had failed the requisite exam."  ECF 55-1 ¶ 33.  Instead, he asserts that Lieutenant Shawn Burns was slated for the role.  Id.  at ¶ 32.

[7] Mayor Hepkins then met with Ingram on January 6, 2022, and confirmed the substance of Ingram's meeting with Johnson.  ECF 55-1, Ex. 15.  He likewise sent the Fraternal Order of Police a "special report" documenting his meeting with Ingram.  Id

being terminated because [the Council] want a black police Chief.'"  Id.  Brooks responded this was "a lie" and that "nobody is talking about a black police Chief."  Id.[8]

During the meeting, several residents and members of the police department spoke out in support of Paparo.[9]  ECF 55-1 ¶ 41.  Ultimately, the Council did not bring a vote to terminate Paparo's employment that night.  Id.; ECF 47-1 ¶ 33.

### G. February 5th Conference

On February 5, 2022, Individual Defendants and Councilmember Beaty attended a "Pennsylvania Association of Boroughs" conference.  ECF 55-1 ¶ 43.  According to Councilmember Beaty, at this conference, Defendant Council-Harris informed Beaty the Council had decided to offer Chief Paparo three-months' severance if he were to resign, and if he did not accept, he would be terminated.  Id. at ¶ 44.  Beaty testified she was surprised and upset by this news because no vote of the Borough Council had been proposed or taken to support this plan.  Id. at ¶ 45.

---

[8] All four Individual Defendants have testified here and denied that race played a factor in Paparo's eventual termination.  Defendant Council-Harris testified that she "never heard Defendant Johnson talk about wanting a black Chief" and never told "Defendants Brooks or Jones-Waters that she gave the go ahead to Johnson to call Ferdie Ingram."  ECF 47-1 ¶¶ 160-61.  Likewise, Defendant Brooks allegedly "never heard Defendant Johnson make a statement that she wanted a black Chief until sometime later when she questioned it in a text message" and "did not recall the statement being made at the meeting of January 2, 2022."  Id. at ¶¶ 164-65.  Further, Defendant Jones-Waters "denied ever hearing Defendant Johnson make any statement about replacing Paparo with a black Chief and she left the meeting at Illusion's because she was only there to discuss reorganization and recalled no discussion about replacing Paparo."  Id. at ¶ 175.

[9] Moreover, Paparo notes that in January and February 2022, an online petition was signed by over a thousand residents expressing support for Paparo and "voic[ing] their opposition to his being targeted by the individual defendants because of the color of his skin."  ECF 55-1 ¶¶ 41-42.

### H.  February 7th Ultimatum

On February 7, 2022, Paparo then met with Defendant Council-Harris, Mayor Hepkins, and Borough Manager Isaac Dotson.  Id. at ¶¶ 46-47; ECF 47-1 ¶¶ 34-37.  During that meeting, Defendant Council-Harris offered Paparo the three-month' severance ultimatum she had previewed to Beaty.  Id.  According to Defendant Council-Harris, she believed a majority of the Council supported this plan, based on conversations "in executive session" and "in telephone conversation."  ECF 55-2, Ex. 6 at 50-53.

### I.  February 8th Philadelphia Inquirer Article

On February 8, 2022, the Philadelphia Inquirer published an article entitled: "A Delaware County Police chief might be fired. His supporters say it's because he's white."  ECF 55-1 ¶ 70. In that article, Defendant Council-Harris conveyed that a vote to terminate Paparo "could come as soon as [that] week."  Id.  Defendant Council-Harris likewise conveyed that she was "confident she has the support of a majority of the seven-member council in a move to oust the chief."  Id.

Like the present suit, Defendant Council-Harris and "other detractors" asserted that "Paparo has been a poor steward of borough resources, costing the town $387,000 to a settle a union grievance that he hired too many part-time officers to supplement the force during the height of COVID-19 and civil unrest in 2020."  ECF 55-2, Ex. 23.  In contrast, "Yeadon Mayor Rohan Hepkins and Councilmember Liana Roadcloud told The Inquirer that [Defendant] Johnson specifically mentioned Paparo's race in conversations about the plan to oust him."  Id.  And, consistent with testimony in this case, the article notes that "Councilmember Learin Johnson called one of Paparo's subordinates, who is Black, and asked if he'd be interested in taking over as chief," which "Paparo's supporters interpreted [] as racially motivated."  Id.

8

### J.   February 10th Public Session

On February 10, 2022, the Council held a "public session," which Paparo contends was for the purpose of firing him.  ECF 55-1 ¶ 71; ECF 47-1 ¶ 39.  At that session, Individual Defendants created the following two posters and placed them in public view:



ECF 55-2, Exs. 25, 26.  Paparo's counsel also attended this meeting and moved to disqualify all four Individual Defendants from the vote to terminate Paparo.[10]  ECF 55-1 ¶ 79.  In

---

[10] Paparo's counsel also moved to disqualify Defendant Brooks for another, independent reason. According to Paparo, Brooks had owned a local business, and her family had "voiced complaints to plaintiff Paparo and Mayor Hepkins about the Police Department's ticketing of unlawfully parked cars at [the business] and other law enforcement actions it took in response to complaints

response, the Council convened privately in an "executive session," after which it adjourned to reschedule for a future session, ostensibly for the purpose of providing Paparo with a "Due Process" hearing.  Id. at ¶ 81.

### K.  February 12th Letter

On February 12, 2022, Yeadon Solicitor Mark Much sent a letter to Paparo's counsel.  ECF 47-1 ¶ 71.  The letter accused Paparo of a "performance deficiency" for "violat[ing] the terms of the [CBA] by scheduling part-time officers to work more hours than permitted under the [CBA]," which "resulted in the entry of a Consent Award that requires the Borough of Yeadon to pay three hundred eighty-seven thousand ($387,000) dollars to the full-time Yeadon Borough Police Officers whose rights under the [collective bargaining agreement] had been violated by Chief Paparo."  ECF 47-4, Ex. M.  The letter also invited Paparo to attend a February 17th Council meeting to "discuss and consider the performance deficiency identified," specifically framing this meeting as a chance for Paparo to "participate and take advantage of the opportunity to respond" to these allegations.  Id.

### L.  February 17th Public Session

At the subsequent public session, the Council again accused Paparo of having violated the CBA and costing the Borough $387,000.  ECF 47-4, Ex. O.  Both Paparo's counsel and Paparo spoke at length, highlighting Paparo's "innocence of the allegations, his stellar performance as Police Chief for the Borough, and overall good name."  ECF 47-1 ¶ 93.  Paparo's counsel also again requested that the four Individual Defendants recuse themselves, but Paparo contends Defendant Council-Harris "refused to even bring the motions up for a vote, much less did the

---

about unruly patrons."  Id. at ¶ 80.  Paparo further contends that he refused to curtail proper policing practices to abate the complaints, a position he alleges upset Defendant Brooks's family. ECF 55-2, Ex. 21 at 7-11.

individual defendants even make an effort to dispute the evidence of bias and partiality against them."  ECF 55-1 ¶ 87.

By a vote of four-to-three, the Council terminated Paparo.  Id. at ¶ 83; ECF 47-1 ¶¶ 101-103.  All four Individual Defendants voted in favor of termination, while Councilmembers Roadcloud, Monroe, and Beaty, all of whom are Black, opposed.  Id.  Notably, Councilmember Roadcloud contemporaneously stated the public session "was ridiculous" and the vote "was about race; this is not about money."  ECF 47-1 ¶ 98; ECF 55-1 ¶ 84.  Indeed, the record reflects the three dissenting Councilmembers "unequivocally" continue to believe that Paparo was fired, at least in part, on account of his race.  ECF 55-2, Ex. 2 at 63-64; ECF 55-2, Ex. 4 at 21-25; ECF 55-2, Ex. 5 at 172.  Individual Defendants likewise concede that Mayor Hepkins, who is Black, also "believes Chief Paparo may have been fired on account of his race," but caveat that Hepkins' basis for that belief was from just one person conveying that "they're firing Chief Paparo because this is a black town, [and] we need a black chief."  ECF 47-1 ¶ 113.

### M. Paparo's Replacement

After Paparo's termination, the Council voted to install Lieutenant Shawn Burns, who is White, as Paparo's interim replacement.  Id. at ¶ 116.  The Council eventually hired Henry J. Giammarco Jr., who is also White, as the full-time Chief of Police.  ECF 55-2, Ex. 13 at 40.  Defendants cite this as a key piece of evidence in their favor.

### N.  Post-Termination Wages and Benefits Dispute

On February 21, 2022, Paparo's counsel sent a letter to Borough Solicitor Much to notify Much that Paparo was seeking post-employment wages and benefits pay for "all the vacation hours, earned comp time, sick days and termination to which he is entitled."  ECF 55-1 ¶ 94.  The letter explained that Paparo believed his employment agreement required the Borough to "provide

Paparo with all the benefits provided to police officers pursuant to the Police Collection Bargaining Agreement," which supposedly called for those payouts.  ECF 55-2, Ex. 32.

On March 5, 2022, Paparo then emailed Borough Manager Dotson to clarify the hours to which Paparo believed he was entitled.  ECF 55-1 ¶ 95; ECF 55-2, Ex. 33.

On March 7, 2022, Borough Manager Dotson responded that he had forwarded the information Paparo provided to Solicitor Much and Finance Director Nichols.  ECF 55-2, Ex. 33.

On March 24, 2022, Paparo followed up with Dotson, noting he had not received any post-employment wages and benefits in the 35 days since his firing.  Id.  At Dotson's deposition in this case, he agreed "there was a delay" with the Borough's review of Paparo's payout claims, which "resulted in multiple missed pay periods for [] the hours that [Paparo] believed that he was owed under the contract."  ECF 55-1 ¶¶ 100-101.

On April 4, 2022, Paparo provided the Borough with a "detailed analysis" of the hours Paparo claimed to be owed, arguing the Borough was obligated to pay Paparo for 776 hours of severance, resulting from a combination of vacation, compensation time, and sick leave.  Id. at ¶ 103.

By contrast, Thomas Reynolds, the current FOP Treasurer and a former Yeadon FOP representative, has submitted an affidavit in connection with these motions, stating that (1) Yeadon's Police Chief is a salaried employee, and thus is not entitled to any comp time unless his contract specifically provides for it, and (2) "[u]nder the Collective Bargaining Agreement, when an office leaves for any reason other than a normal or disability retirement, they do not get compensated for unused sick time or unused vacation time."  ECF 47-1 ¶ 196; ECF 47-6, Ex. EE.

To date, Paparo has not received any post-termination payout.  ECF 55-1 ¶ 107.  That said, Defendants—who believe Paparo's payout is capped at 160 hours—previously offered 200 hours

to settle this dispute, which Paparo supposedly declined.  ECF 47 at 22.  Nonetheless, Paparo contends Defendant' refusal to pay these alleged post-employment benefits are a form of retaliation for his filing suit here.  ECF 10 ¶¶ 101-107.

### O.  Fast Facts Flyer

Paparo likewise directs this Court to the "Truth Matters" fact sheet (herein, "Fast Facts flyer") to bolster his claims of retaliation.  ECF 55-2, Ex. 37.  This flyer, created at the direction of Individual Defendants, was initially distributed at a public session the same day Paparo filed suit:

## 10 Fast Facts Yeadon Residents Want to Know

**6  Did Mr. Paparo's race play a role in Council's decision to remove him from his position as alleged by Mr. Paparo, Mayor Hopkins, Councilwoman Latoya Monroe and Councilwoman Liana Roadcloud?**

Race played no role whatsoever and all accusations of racism have been categorically denied. The same black Councilwomen they are accusing of removing Mr. Paparo because he is white are the same black Councilwomen who "hired" Mr. Paparo — choosing him for the Chief of Police position over three qualified black candidates. Additionally, the person Council appointed to lead the police department after removing Mr. Paparo is a white male just like Mr. Paparo. It is widely believed that those who are "playing the race card" are only doing so to distract this community from their own culpability in Mr. Paparo's violation of the Police Collective Bargaining Agreement, which cost the Borough $387,000.

**7  What about the petition to "Keep Chief Chachi" that collected more than 1,000 signatures?**

We encourage everyone to exercise their right to peacefully protest via petition. It is, however, important to note that this petition misleads people into signing it based on an outrageous claim of racism. It is also worth noting that the number of Yeadon residents who signed the petition has not been verified. And many residents in this community have reported having their "signatures" added to the petition without their consent.

**8  Did Council provide Mr. Paparo with due process before removing him from his position?**

Yes. Council President Sharon Council-Harris has consistently and publicly said that in January 2022, she requested three times that Mr. Paparo meet with her to discuss his actions, which put the Borough in a $387,000 predicament. But he declined each time. Yeadon Borough Council also provided Mr. Paparo with an opportunity to address his actions before Council on February 17, 2022.

**9  Did Mr. Paparo provide Council President Sharon Council-Harris, Council Vice President Learin Johnson, Councilwoman Carlette Brooks and Councilwoman Taliah Jones-Waters with any kind of "due process" before telling numerous media outlets these women wanted to oust him because of the color of his skin?**

No. Instead of letting these four Councilwomen know he was allegedly hearing "rumors" that they wanted to oust him because of his race, he went straight to the press and blasted his allegations to numerous media outlets creating a media firestorm for Yeadon along with Mayor Hopkins, Councilwoman Monroe and Councilwoman Roadcloud. At no point did Mr. Paparo even ask the four Councilwomen in question if the "rumors" he was allegedly hearing were true. Let the record show that these four Councilwomen provided Mr. Paparo with due process while being denied due process themselves.

**10  Who is leading the Yeadon Police Department now?**

Leadership of the Police Department is in the capable hands of Police Lieutenant Shawn Burns. Council appointed Lieutenant Burns as Officer-in-Charge on February 17, 2022. Lieutenant Burns has been with the Yeadon Borough Police Department for 20 years.



*Message from Councilwomen Jones-Waters, Johnson, Council-Harris, and Brooks:*

*While there are seven women on Yeadon Borough Council, pictured are the four of us who were thrust into a media firestorm and labeled racists, an allegation we unequivocally deny. As we look ahead and work together to move Yeadon forward, we hope these 10 fast facts will help you cut through some of the noise that remains after the storm. Truth matters. And with so much misinformation circulating throughout the community, it is our responsibility to provide you with factual information that can easily be substantiated.*

*Left to Right: Yeadon Borough Councilwomen Taliah Jones-Waters, Learin Johnson, Sharon Council-Harris and Carlette Brooks.*


**TRUTH MATTERS**

Id.; see also ECF 55-1 ¶ 108.  The flyer was also then (1) posted to the Council's website on March 8, 2022, where it remained until July 2023; (2) mailed to each of the residents of the Borough; (3) posted on the Borough's social media accounts; and (4) distributed in the Borough's newsletter. ECF 55-1 ¶¶ 113-114.  Notably, this public dissemination continued over the objection of several Borough officials, who advised Individual Defendants that distribution would potentially expose

the Borough to greater litigation liability, in part because "it had become obvious" the flyer contained information "to the detriment of Paparo." Id. at ¶¶ 119-120.

## II.    PROCEDURAL HISTORY

Paparo filed his initial Complaint on March 7, 2022.  ECF 1.  He then filed an Amended Complaint on April 21, 2022.  ECF 10.  The Amended Complaint brought the following eight claims against the Borough and Individual Defendants:

- **Count I**: Violations of Paparo's right to equal employment under 42 U.S.C. §§ 1981 and 1983 against the Borough;

- **Count II**: Violations of Paparo's right to equal employment under 42 U.S.C. §§ 1981 and 1983 against the Individual Defendants;

- **Count III**: Violation of 42 U.S.C. § 1985(3) against the Individual Defendants;

- **Count IV**: Violation of Paparo's due process right to a fair and impartial process hearing against all Defendants;

- **Count V**: Retaliation in violation of federal law against all Defendants;

- **Count VI**: Defamation against all Defendants;

- **Count VII**: False Light Privacy against all Defendants;

- **Count VIII**: Violation of the Pennsylvania Wage Payment and Collection Law against all Defendants.

Id. at 27-37.

On May 9, 2022, Defendants jointly filed a Motion to Dismiss Counts I, IV, VI, and VII. ECF 11.  On October 7, 2022, this Court denied the Motion as to Counts I and IV for all Defendants, and as to Counts VI and VII for Individual Defendants, but granted the Motion as to Counts VI and VII in favor of the Borough.  ECF 13; Paparo v. Borough of Yeadon, 2022 WL 6184890, at *8 (E.D. Pa. Oct. 7, 2022).  Extensive discovery followed.

On November 9, 2023, Paparo filed a Motion for Partial Summary Judgment with respect to (1) Defendants' refusal to pay Paparo the post-employment wages and benefits to which Paparo alleges he is contractually entitled; and (2) Defendants' damage to Paparo's reputation that has allegedly impeded his ability to obtain another job.  ECF 46.  Both the Borough and Individual Defendants responded on December 8, 2023, to which Paparo replied on December 15, 2023.  ECF 56, 59, 61.

On November 10, 2023, the Borough and Individual Defendants filed separate Motions for Summary Judgment on all counts.  ECF 47, 48.  Paparo responded to the Individual Defendants' Motion on December 7, 2023, ECF 55, and to the Borough's Motion on December 8, 2023, ECF 58.  The Borough replied to Paparo's Counterstatement of Facts on December 22, 2023.  ECF 65.

The Court provided questions to counsel for oral argument on January 24, 2024, ECF 73, and argument was held on January 26, 2024.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court

that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

## IV.   DISCUSSION

### A.  The Borough

#### 1.   42 U.S.C. §§ 1981 and 1983 (Count I)

The Borough first seeks summary judgment on Paparo's racial discrimination claim, brought under 42 U.S.C. §§ 1981 and 1983.  ECF 48 at 29.

As this Court explained in denying the Borough's Motion to Dismiss, a municipality may be sued under section 1981 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell v. Dept. of Social Servs. of City of New York, 436 U.S. 658, 690 (1978).  To succeed on a claim for municipal liability, a plaintiff must demonstrate that the defendant's policies or customs caused the alleged constitutional violation.  Id. at 694; Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).  The plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was."  McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009).  But "[a] policy need not be passed by a legislative body, or even be in writing, to constitute an official policy for the purposes of § 1983.  A pertinent

decision by an official with decision-making authority on the subject constitutes official policy."

Porter v. City of Philadelphia, 975 F.3d 374, 383 (3d Cir. 2020).  Thus, "[i]f the decision to adopt

that particular course of action is properly made by that government's authorized decision makers,

it surely represents an act of official government 'policy' as that term is commonly understood."

Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).

Notably, the Borough does not contest that, under Pennsylvania law, "a majority vote of

the quorum [of Councilmembers] present at meetings constitutes the action of a borough" that may

be subject to Monell liability.  ECF 48 at 30 (citing to 8 Pa. C.S. §§ 1001(b), 1202, 1104(g);

Meixell v. Borough Council of Borough of Hellertown, 88 A.2d 594, 596 (Pa. 1952); LaVerdure

v. Cnty. of Montgomery, 324 F.3d 123, 125 (3d Cir. 2003)).

Instead, the Borough relies on Monell's further requirement that the official action by the

municipality must itself be the "'moving force behind the constitutional violation.'"  City of

Canton v. Harris, 489 U.S. 378, 389 (1989) (citations omitted) (emphasis added).  Put differently,

the Borough contends Paparo has failed to show that "race was a but-for cause of [his] injury."

Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1014 (2020); see also

Williams v. Tech Mahindra (Americas) Inc., 70 F.4 646, 651 (3d Cir. 2023).  More precisely, the

Borough asserts that but-for causation requires Paparo to demonstrate that a majority of the

Council "acted with constitutionally dubious reasons vis-à-vis [his] employment," but that Paparo

has not done so here.  ECF 48 at 31-32 (citing to LaVerdure, 324 F.3d at 126).

Initially, the Borough concedes—for the purposes of summary judgment—that Defendants

Johnson, Council-Harris, and Jones-Waters "may have been motivated by race in their individual

votes to terminate him."  Id. at 32.  Thus, the Borough instead pins it hopes entirely on Defendant

Brooks, contending the "difficulties regarding Councilmember Brooks's business [were] the sole

motivating factor in the events surrounding Chief Paparo's termination." Id. at 33 (emphasis added). In support of that contention, the Borough directs this Court to Paparo's own deposition testimony, in which he describes Defendant Brooks's contemporaneous denial of the Council's intention to replace Paparo on racial grounds. Id. Likewise, the Borough highlights various portions of the record indicating that Defendant Brooks viewed Paparo as having allegedly "falsely accused" her and her husband "of seeking to fix tickets for customers" for Defendant Brooks's private business. Id. at 34 (citations omitted).

The Borough's recounting here is overly myopic and thus unpersuasive. Simply put, it ignores additional evidence that plainly supports Paparo's version of events. Most notably, the Borough fails to acknowledge Defendant Brooks's January 2, 2022 text message to Defendant Council-Harris asking: "Do you know the black police out here in Yeadon? That want the Police chief's job?" ECF 55-1 ¶ 29. While the Borough vaguely attempts to recast this text as a nebulous question devoid of any clear meaning, context belies that attempt—Defendant Brooks sent this text message following two different meetings at which Councilmembers Roadcloud and Beaty testify some or all of the Individual Defendants conveyed their intention to replace Paparo with a Black Chief of Police.

Accordingly, the Court concludes this combination of facts could "cause a reasonable juror to disbelieve [Brooks's] articulated legitimate non-discriminatory reason" for voting to fire Paparo, thereby "creating a genuine dispute of material fact as to the credibility of that reason." Burton v. Teleflex Inc., 707 F.3d 417, 430 (3d Cir. 2013); Iadimarco v. Runyon, 190 F.3d 151, 165-66 (3d Cir. 1999). And because that genuine dispute of fact as to Defendant Brooks's motivation undermines the Borough's quorum-based argument, a jury must decide what causal role, if any, race played in the Borough's decision to fire Paparo.

2. <u>Due Process (Count IV)</u>

The Borough also moves for summary judgment on Paparo's Fourteenth Amendment Procedural Due Process claim.  ECF 48 at 36.  As this Court reviewed the relevant legal standard at length in denying Defendants' Motion to Dismiss, <u>Paparo</u>, 2022 WL 6184890, at *4, it will not do so again here.  Instead, the Court reiterates as needed only those portions of the doctrine related to the Borough's current arguments, which are three-fold.

First, the Borough asserts that Paparo was as an at-will employee, and so "this case does not involve a claimed unconstitutional deprivation of a property right."  ECF 48 at 36.  But, as Paparo persuasively counters, his claim has instead always been rooted in a reputational "liberty interest," which may be "combined with his associated termination from employment" to assert a so-called "stigma plus" Due Process claim.  ECF 58-4 at 20.

Third Circuit precedent supports Paparo's argument, as the Court of Appeals has made clear that a plaintiff "make[s] out a due process claim for deprivation of a <u>liberty</u> interest in reputation [by showing] a stigma to his reputation <u>plus</u> deprivation of some additional right or interest."  <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 236 (3d Cir. 2006) (emphasis added).  More importantly, the Third Circuit has explained that "[a] public employee who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test <u>even if, as a matter of state law, he lacks a property interest in the job he lost</u>."  <u>Id.</u> at 238 (emphasis added); <u>see also</u> <u>id.</u> at 236 ("The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'").  Thus, the Borough's attempt to distinguish between property and liberty interests here is nothing more than a red herring.

Second, the Borough contends that Paparo cannot demonstrate a deprivation of said liberty interest because he "cannot establish that a majority of the board lacked a legitimate, non-

discriminatory, non-racially motivated reason to terminate him."  ECF 48 at 37.  As just explained, however, a genuine dispute of fact exists regarding each Individual Defendants' motivations for the firing, thus undermining this second contention.

Third, the Borough asserts the only "process due a claim of stigma-plus violation is simply the opportunity for a name-clearing hearing," id. at 38, and the Council's series of public and executive sessions in January and February of 2022 provided Paparo with a "wholly adequate name-clearing hearing," id. at 40.  In so arguing, the Borough further asserts "there is no requirement that the name-clearing hearing be before a non-biased, impartial decisionmaker."  Id. at 45.  The outcome of that hearing, the Borough contends, is entirely immaterial.

This argument is unavailing, particularly since this Court already concluded precisely the opposite in denying the Borough's Motion to Dismiss.  There, this Court explained the Third Circuit recognizes "two kinds of procedural due process violations: those that arise from insufficient procedural safeguards and those that arise from decisionmaker bias."  Paparo, 2022 WL 6184890, at *6 (citing to United Retail & Wholesale Emps. Teamster Union Local No. 115 Pension Plan v. Yahn Mc Donnell, Inc., 787 F.2d 128, 137-38 (3d Cir. 1986)) (emphasis added).[11]

On this latter bias prong, "[a]n unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case."  Id. (citing to Williams v. Pennsylvania, 579 U.S. 1, 8 (2016); In re Murchison, 349 U.S. 133, 136-37 (1955); Lyness v. Com., State Bd. of Medicine, 605 A.2d 1204, 1208 (Pa. 1992)).  Moreover, to make such a showing, "all [a plaintiff] needs to establish is that the [adjudicatory panel] was infected with 'the appearance of non-objectivity.'"  Id. (citing to Purcell v. Reading School District, 167 A.3d 216, 226 (Pa. Commw. Ct. 2017); Withrow v. Larkin, 421 U.S. 35, 54 (1975)).

---

[11] Likewise, Individual Defendants actively concede that "[d]ecision maker bias can form the basis for a due process violation."  ECF 47 at 14.

Here, the crux of Paparo's claim remains unchanged since this Court's earlier denial, and discovery has in no way diminished the potential validity of that claim.  Indeed, the record reflects a genuine dispute as to the same core allegations to which this Court previously cited—namely whether each Individual Defendant (1) expressed personal bias and prejudgment on the matter of Paparo's employment; (2) was motivated to remove Paparo from his position as Chief of Police in order to replace him with a Black Chief of Police; (3) undertook efforts to find a Black replacement for Paparo before they had investigated or ruled upon any justification to terminate Paparo's employment; (4) attempted to pressure Paparo to resign before doing so, and (5) pushed through a vote unchecked by the three other Borough Council members or by the Mayor of Yeadon.  Id. (citing to Amended Complaint).

As such, a jury must decide whether the due process provided to Paparo, even if facially valid, was "infected with the appearance of non-objectivity."  Purcell, 167 A.3d at 225.  While the Borough repeatedly argues the mere "opportunity to be heard" satisfies due process even if a claimant appears before biased decision makers, ECF 65 at 9-11, the Borough fails to appreciate that such a tainted forum provides no opportunity at all.

3.   Pennsylvania Wage Payment Collection Law (Count VIII)

The Borough lastly moves for summary judgment on Paparo's claim brought under the Pennsylvania Wage Payment & Collection Law ("WPCL").  ECF 48 at 46.  Primarily, the Borough asserts that the WPCL defines "employers" to include "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the abovementioned classes employing any person in this Commonwealth," and therefore omits liability for a municipal corporation like the Borough.  Id. at 47 (citing to 43 P.S. § 260.2a).

22

In support of this argument, the Borough observes that the Pennsylvania Commonwealth Court has long "exempted municipal entities from the WPCL since it first confronted this issue in 1991," and "courts for the Eastern and Western Districts of Pennsylvania—have followed its approach." Carstetter v. Adams Cnty. Transit Auth., 2008 WL 2704596, at *14 (M.D. Pa. July 8, 2008); Gallaher v. Goldsmith, 213 F. Supp. 2d 496, 499 (E.D. Pa. 2002); Scott v. Philadelphia Hous. Auth., 2011 WL 1791095, at *10 (E.D. Pa. May 11, 2011); Morrow v. Cnty. of Montgomery, Pa., 2014 WL 348625, at *3 (E.D. Pa. Jan. 31, 2014) (discussing cases in the context of analogous PMWA provision); Atland v. York Cnty. Transp. Auth., 2009 WL 922488, at *2-3 (M.D. Pa. Apr. 3, 2009). These courts have reasoned "there is a clear distinction between municipal and private corporations and, if the legislature wished that municipal corporations be covered by the Law, it could have easily included them." Huffman v. Borough of Millvale, 139 Pa. Cmwlth. 349, 352 (1991). Thus, under "the legal maxim, expressio unius est exclusio alterius," they have concluded municipal corporations such as a Borough are not included within the definition of "employer," and that it would be incorrect to "expand the definition" to sweep in such entities. Id.; see also Philipsburg-Osceola Educ. Ass'n by Porter v. Philipsburg-Osceola Area Sch. Dist., 159 Pa. Cmwlth. 124, 129 (1993).

Yet, as the Borough readily admits, "[n]either the Pennsylvania Supreme Court nor the United States Court of Appeals for the Third Circuit have addressed this issue." Carstetter, 2008 WL 2704596, at *14. And more recently, Judge Wolson rejected the "assumption in Huffman and Porter that the term 'corporation' refers to private corporations only." Fayad v. City of Philadelphia, 2023 WL 2955894, at *4 (E.D. Pa. Apr. 14, 2023). Instead, he concluded that "[t]he express text of the [similarly worded PMWA] does not draw a distinction between public and private corporations." Id.

This Court finds Judge Wolson's analysis persuasive.  Simply put, a court's "interpretive task begins and ends with the text of the statute unless the text is ambiguous or does not reveal congressional intent 'with sufficient precision' to resolve our inquiry." Jensen v. Pressler & Pressler, 791 F.3d 413, 418 (3d Cir. 2015); see also 1 Pa.C.S.A. § 1921(b) ("[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").  Applied here, as Judge Wolson explained, the "plain and ordinary meaning of 'corporation'"—both now and at the time the WPCL was enacted—is unambiguously "broad enough to include municipal corporations." 2023 WL 2955894, at *3.  So this Court "need not look beyond the text" to conclude that it applies to municipal corporations like the Borough. Roth v. Norfalco LLC, 651 F.3d 367, 380 (3d Cir. 2011).  As such, in view of that applicability, this Court further concludes that Paparo's WPCL may proceed against the Borough.[12] Accordingly, the Borough's motion for summary judgment is **DENIED** in full.

### B.  Individual Defendants

### 1.  42 U.S.C. §§ 1981 and 1983 (Count II)

Individual Defendants, like the Borough, move for summary judgment on Paparo's racial discrimination claims brought under 42 U.S.C. §§ 1981 and 1983.  ECF 47 at 9.  Yet, for the same

---

[12] The Court separately notes that Paparo's further contention that the Borough has waived this argument is unavailing.  While Paparo is correct the Borough did not raise this interpretive argument prior to the present motion, "a defendant does not waive an affirmative defense if [h]e raise[s] the issue at a pragmatically sufficient time, and [the plaintiff] [is] not prejudiced in its ability to respond.'"  Charpentier v. Godsil, 937 F.2d 859, 864 (3d Cir. 1991) (citations and quotations omitted).  Here, the Court perceives no prejudice to Paparo.  The Borough's argument depends solely on its status as a municipality, thus precluding any sort of prejudice to Paparo's discovery efforts.  Likewise, the Borough squarely raised this argument in its opening brief, and so Paparo has had more than a sufficient opportunity to respond.  Thus, it is proper for this Court to reach the merits, both for the Borough, and for Defendants' remaining "derivative" suit claims, which the Court addresses separately below in reference to Individual Defendants' similar claim.

reasons the Borough's motion must be denied for Count I, so too must Individual Defendants' motion for Count II.

In support of their motion, Individual Defendants essentially argue that (1) each Individual Defendant lacked awareness of their Co-Defendants' actions or words that might have indicated an intent to replace Paparo with a Black Chief of Police, and/or (2) each Defendant voted to terminate Paparo for a reason other than race.  Id. at 9-10.  In relevant part, Individual Defendants contend

> The evidence does not establish that Tomeka Jones-Waters or Carlette Brooks had any awareness that Learin Johnson was going to contact Ferdie Ingram on January 3, 2022 before they took office. Sharon Council-Harris testified that she may have approved the contact but never told Brooks or Jones-Waters. It is clear that Brooks took action against the Plaintiff because she believed he lied about her and her husband when he circulated an email in early February, 2022 suggesting that she was trying to fix tickets. It is clear that Tomeka Jones-Waters took the action to vote against him because of the $387,000 payment.

Id.  But these assertions, again, ignore the detailed set of documentary and testimonial evidence that Paparo has put forth—for each Individual Defendant—from a which reasonable juror might reach the opposite conclusion.[13]

For instance, Councilmember Monroe expressly testified that "Councilor Jones-Waters, Councilor Johnson, and Councilor [] Council-Harris . . . all indicated directly to me at one point or another that Yeadon is a black town that deserves a black police chief."  ECF 55-2, Ex. 4 at 22.

Likewise, Councilmembers Beaty and Roadcloud testified that, at multiple meetings on January 2, 2022, Defendant Johnson expressed a desire to replace Paparo with a Black Chief of

---

[13] The Court reiterates the Borough itself has conceded the record supports a finding that Defendants Council-Harris, Jones-Waters, and Johnson "may have been motivated by race in their individual votes to terminate [plaintiff Paparo]."  ECF 48 at 32.

Police, and that Council-Harris and Jones-Waters affirmatively agreed with Johnson.  ECF 55-2, Ex. 2 at 42-44; ECF 55-2, Ex. 5 at 20-23; ECF 55-2, Ex. 10.

True, as Individual Defendants note, the record is less clear as to whether Defendant Brooks actively voiced support for this plan.  ECF 47 at 10.  But, as explained above, Defendant Brooks's attendance at these various meetings, along with her after-the-fact text, could lead a reasonable juror to conclude that Defendant Brooks both supported and participated in a plan to replace Paparo with a Black Chief of Police.

To be sure, a jury may ultimately choose to believe Individual Defendants' version of events over Paparo's.  The jury would be free to credit, for instance, that three of the Individual Defendants voted to hire Paparo in the first place and eventually also replaced him with Lieutenant Burns, who is White.  Nonetheless, the Court is persuaded that a genuine dispute of material fact exists for each Individual Defendant's motivation for the firing, thus precluding summary judgment on Count II.

As a final aside, Individual Defendants' arguments regarding a purported lack of state action here also cannot save their motion.  ECF 47 at 10-11.  Individual Defendants assert, in essence, that because they had not been sworn in when several of these key meetings and conversations occurred, those communications are immaterial for the purposes of Paparo's section 1981 claim.  Id.  This contention misconstrues the import of these earlier activities.  Paparo's argument is not that each pre-January 3, 2022 meeting, text, or call was an official state act.  It is instead that these correspondences serve as evidence of Individual Defendants' motivation in eventually terminating Paparo on February 17, 2022, an action which Individual Defendants unequivocally took under color of state law.

2.  42 U.S.C. § 1985(3) (Count III)

Individual Defendants' conspiracy-related arguments fare no better.  They contend, in a somewhat conclusory manner, that Paparo "simply cannot establish [a] conspiracy among the four individual Moving Defendants."  Id. at 12.  In so doing, however, Individual Defendants rely on the exact same arguments related to individual awareness made with respect to Count II, which this Court has just rejected.  The numerous meetings and confirmatory texts among each of the Individual Defendants—in which they discuss the possibility of replacing Paparo with a Black Chief of Police—likewise raises a genuine dispute as to whether Individual Defendants conspired to do so.  So here too, a jury must decide whether any such conspiracy existed.

3.  Due Process (Count IV)

Individual Defendants next move for summary judgment on Paparo's Fourteenth Amendment Procedural Due Process claim, incorporating the Borough's arguments by reference.  Id. at 14.  Indeed, the vast majority of Individual Defendants' contentions precisely parallel those made by the Borough, as they assert: (1) "Plaintiff cannot establish a conflict of interest" or "actual bias," (2) "Plaintiff was an at-will employee who was not entitled to a property interest in his job," and (3) "[t]he hearing provided on February 17, 2022, was sufficient to meet the requirements of a name clearing hearing's due process requirements."  Id. at 14-18.  For the same reasons the Borough's motion fails, those arguments are equally unpersuasive as applied to Individual Defendants.

a.  Defamation

Individual Defendants further contend, however, that Paparo's Due Process "stigma plus" claim independently fails because the record does not support the requisite finding of defamation— i.e., actions or words that "damages a person's reputation, honor, or integrity on the basis of false

27

information and implies that it is based on undisclosed or false facts because the listener is unable to evaluate the soundness of the opinion."  Id. at 20 (citing to Kane v. Chester City, 2019 U.S. Dist. LEXIS 71312, at *11 (E.D. Pa. 2019)) (emphasis added).  Specifically, Individual Defendants assert the allegedly defamatory statements to which Paparo directs the Court—namely the visual aids at the February 10, 2022 public session—contain only true information, and when "a person offers opinions that are supported by true facts, the opinion is not defamatory, no matter how derogatory or unreasonable the statement may be."  Id. at 20-21.

This argument, much like Individual Defendants' section 1981 contentions, turns on Individual Defendants' further assertion that it is unequivocally true Paparo was not fired on account of race.  As described at length above, however, a genuine dispute exists as to whether Individual Defendants' campaign to fire Paparo was pretextual.

Moreover, while Individual Defendants may be correct they never overtly "accused Plaintiff of theft," id. at 20, such a framing misconstrues Paparo's claim.  This Court has previously explained that Paparo instead contends "the posters falsely suggested that the Plaintiff had violated contracts which resulted in misuse of taxpayer funders" and "ma[d]e it appear that [Plaintiff] was a thief."  Paparo, 2022 WL 6184890, at *4 (citations omitted) (emphasis added).   And a genuine dispute remains whether this contention is accurate.  The Consent Award's own absolution that it has "no precedential value or effect whatsoever with respect to any other set of facts or decisions" and its further express waiver that it "does not constitute an admission of any wrongdoing on the part of the Borough or any of its officers, agents, employees and/or representatives," ECF 55-1 ¶¶ 64-65, must be balanced against Individual Defendants' disparaging posters and Paparo's June 2021 email to Borough Officials taking "full responsibility for getting [the Borough] into this matter," ECF 47-4, Ex. Q.

Moreover, even if this Court were to assume Paparo was at "fault" for the FOP grievance, a genuine dispute remains as to whether Individual Defendants pretextually relied on the grievance to terminate Paparo on the basis of race.  If a jury finds that to be true, it could certainly further conclude that Individual Defendants' messaging to the contrary amounted to defamation. Particularly when this Court considers the testimony from Councilmember Roadcloud, Councilmember Monroe, and Mayor Hepkins—who describe Individual Defendants' messaging as "disgraceful," "misleading," "ludicrous," leading to "the destruction of [plaintiff Paparo's] life," and having been created with "[t]he intent to harm and embarrass and skew the people against our Chief," ECF 55-2, Ex. 2 at 35; ECF 55-2, Ex. 4 at 32, ECF 55-2, Ex. 1 at 71, 141-43—the Court is convinced that a jury could find this potentially defamatory campaign supports a "stigma plus" Due Process claim.

### b.  Borough Code

Individual Defendants' final two arguments—based on the Pennsylvania Borough Code— are equally unavailing.  They assert that (1) "a member of the council shall not be disqualified from voting on any issue before the council solely because the member has previously expressed an opinion on the issue in either an official or unofficial capacity," and (2) the "rule of necessity" required the vote without recusal of council members.  ECF 47 at 15-16 (citing to 8 Pa.C.S. § 1001(d); Wells v. Unemployment Comp. Bd. Of Review, 236 A.3d 108, 111 (Pa. Cmwlth. 2020); Stroudsberg Area Sch. Dist. v. Kelly, 701 A.2d 1000 (Pa. Cmwlth. 1997); Siteman v. City of Allentown, 695 A.2d 888 (Pa. Cmwlth. 1995)).  As Paparo persuasively counters, this Court's crediting of either argument would "elevate[] state procedural law over federal constitutional law." ECF 55-4 at 22.  Indeed, longstanding Supreme Court precedent makes clear that "minimum [procedural] requirements [are] a matter of federal law" and are thus "not diminished by the fact

that the State may have specified its own procedures that it may deem adequate for determining

the preconditions to adverse official action." Vitek v. Jones, 445 U.S. 480, 491 (1980).  As such,

both of Individual Defendants' arguments here fall short.

### 4.   Retaliation (Count V)

Individual Defendants next seek summary judgment on Paparo's retaliation claim.  ECF

47-1 at 21.  Such claims "arise post-employment when an employee who has been terminated files

[a section 1981 action] charging discrimination in discharge only to meet continued harassment

from its employers in retaliation for the filing of the action." Charlton v. Paramus Bd. of Educ.,

25 F.3d 194, 198 (3d Cir. 1994).  In analyzing such claims, courts rely on the three-step burden

shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973).  See, e.g., Canada v. Samuel Grossi & Sons, Inc., 49 F.4 340, 346 (3d Cir. 2022);

Curry v. Devereux Found., 541 F. Supp. 3d 555, 559 (E.D. Pa. 2021) (noting "[t]he elements of a

§ 1981 employment discrimination claim are identical to those brought under Title VII").  To

establish the prima facie case, a plaintiff must first show

> (1) a protected employee activity;
> (2) an adverse action by the employer either after or contemporaneous with the
> employee's protected activity; and
> (3) a causal connection between the employee's protected activity and the
> employer's adverse action.

Canada, 49 F.4 at 346.  Upon that initial showing, the burden then "shifts to the employer to

advance a legitimate, non-retaliatory reason for its adverse employment action."  Krouse v. Am.

Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997).  If the employer satisfies that burden, the plaintiff

must finally be able to demonstrate that both "the employer's proffered explanation was false, and

that retaliation was the real reason for the adverse employment action."  Canada, 49 F.4 at 346

(citation omitted).

In the post-employment context, an action is sufficiently adverse if it "results in discharge from a later job, a refusal to hire the plaintiff, or other professional or occupational harm." Charlton, 25 F.3d at 200; see also Nelson v. Upsala Coll., 51 F.3d 383, 388 n.6 (3d Cir. 1995). Likewise, courts have accepted as sufficiently adverse the "discontinuance of severance benefits" in response to the filing of an action.  Nelson, 51 F.3d at 388 (citing to EEOC v. Cosmair, Inc., 821 F.2d 1085, 1087 (5th Cir.1987)).

Here, neither party disputes that Paparo's filing of his section 1981 suit constituted a "protected activity," thus satisfying the first element of his claim.  Instead, Individual Defendants assert Paparo has failed to demonstrate any type of sufficiently adverse action, let alone a causal connection between that action and Paparo's suit.  ECF 47 at 21-25.

Paparo counters that the record supports at least two sufficient bases to satisfy these latter elements.  Id. at 21 (citing to ECF 10 ¶ 155).  Those bases include (1) Defendants' publication and distribution of the Fast Facts flyer, in combination with Defendants' allegedly false accusations of theft; and (2) Defendants' refusal to pay accrued benefits supposedly owed to Paparo under his employment agreement and their similar failures to respond to inquiries regarding Paparo's ability to withdraw pension contributions.  Id.[14]  The Court analyzes these issues in turn.

### a.  Publicizing and Distributing the Fast Facts Flyer

The Court turns first to Individual Defendants' dissemination of the Fast Facts flyer, as that dissemination, by itself, precludes a complete grant of summary judgment here.  While Individual

---

[14] Individual Defendants note that Paparo's "pension contributions were returned to him in the spring of 2022, likely within two months after his employment ended" and thus argue "that issue should be moot."  ECF 47 at 22.  That said, at oral argument on January 26, 2024, the parties continued to disagree on whether a genuine dispute remains as to pension funding that Paparo did not himself contribute.  As such, the Court finds it inappropriate to grant Defendants' motion on mootness grounds.  This particular factual dispute instead fits within Paparo's broader argument regarding Individual Defendants' alleged refusal to pay out benefits.

Defendants raise two arguments to avoid this result, neither is persuasive.  First, they contend that because the flyer was initially created on March 7, 2022—the same day the suit was filed—the flyer could not have been retaliation for Paparo's protected conduct.  Id. at 25.  As Individual Defendants put it, "it was not retaliation for any lawsuit," but instead "in rebuttal to the various claims of racism that were being put forth in the press."  Id.  Second, Individual Defendants contend the flyer is "entirely accurate," and publishing accurate information cannot be improper retaliation.  Id. at 24.

On timing, even if Individual Defendants' contemporaneous release of flyer was entirely coincidental, they concede they then continued to "publicize and distribute" the content across a variety of media in subsequent months.  Id. at 22.  But Individual Defendants fail to further explain why, if their initial creation of the flyer was a "rebuttal" to Paparo's public allegations of racism, a reasonable juror could not conclude the continued widespread dissemination was in response to the suit itself.  Otherwise stated, a reasonable juror could find that Paparo's filing of the suit increased the intensity of the ongoing dispute, and Individual Defendants responded in kind.

True, it is possible to parse out and hypothesize about various motives for Individual Defendants' campaign against Paparo.  A factfinder might conclude, for instance, that Individual Defendants engaged in their messaging campaign not to specifically retaliate against Paparo, but instead to persuade the public that a particular version of events was true.  That question, however, is best left to the jury.

Individual Defendants' secondary assertion—that the Fast Fact flyer was "entirely accurate"—likewise does not support summary judgment here.  The flyer expressly attempts to convince the public that "race played no role whatsoever" in Paparo's firing, ECF 55-2, Ex. 37; a contention for which a genuine dispute of fact remains.  If the jury finds the opposite to be true, it

bolsters the notion that the remainder of the flyer was meant to disparage and discredit Paparo. In other words, the truthfulness of the message bears on Individual Defendants' intent to retaliate.

Lastly, to the extent Individual Defendants instead argue the consequences of their campaign were not <u>sufficiently</u> adverse, that contention also lacks merit. Simply put, a reasonable juror could find that Defendants' messaging led to "professional or occupational harm" for Paparo. <u>Charlton</u>, 25 F.3d at 200. Indeed, the record evinces specific instances of subsequent employers refusing to hire Paparo on account of this flyer. Most notably, Mayor Hepkins testified that Paparo

> was not only fired he was humil -- publicly humiliated by putting these 10 facts on the website, on the borough official website, which I believe is still there .. .I remember one particular employer called me, and they wanted to hire him. They loved him .... And then they called me back and said, unfortunately, we can't hire him because of these 10 facts .... He can't get a job; they rendered him unemployable. They destroyed this man, they destroyed his life. They not only fired him, they didn't leave it as that, they destroyed his life, and that is wrong, it's unethical, and it's ungodly.

ECF 55-2, Ex. 1 at 71-72. Such testimony suffices to preclude summary judgment on "adverse action" grounds.

### b. *Post-Employment Wages and Benefits*

Individual Defendants' allegedly wrongful denial of post-employment benefits presents a closer call. Here, Paparo argues the Borough was "legally obligated to pay plaintiff Paparo all the benefits to which he is entitled under the applicable contracts," but that Individual Defendants "have made retaliatory use of their authority by refusing to pay plaintiff any of the benefits he is owed." ECF 55-4 at 28. Two issues impact this claim—one of timing and one of substance.

On timing, recall that Paparo was terminated on February 17, 2022. ECF 55-1 ¶ 83; ECF 47-1 ¶¶ 101-103. He sent his first letter to the Borough seeking post-termination benefits on

February 21, 2022.  ECF 55-1 ¶ 94.  On March 5, 2022, Paparo then emailed the Borough again regarding the hours to which he believed he was entitled.  ECF 55-1 ¶ 95; ECF 55-2, Ex. 33.

As such, these initial requests and communications all occurred before Paparo actually filed suit.[15]  And, by Paparo's own admission, part of the harm he alleges is that the Borough's "delay" in responding to Paparo "resulted in missed pay periods." ECF 55-4 at 30.  Thus, to the extent Paparo targets Individual Defendants' pre-suit silence, he likely cannot succeed.  Prior to March 7, 2022, Paparo has not identified a "protected action" upon which Individual Defendants might have retaliated.

Paparo further notes, however, that he has yet to receive <u>any</u> post-employment wages or benefits.  <u>Id</u>.  This presents a more colorable claim. True, Individual Defendants have consistently maintained that their interpretation of Paparo's contract precludes the payout he seeks, which suggests that Paparo must demonstrate Defendants' position is pretextual.

Defendants' framing here is persuasive, and, in the Court's view, casts doubt on whether Paparo can ultimately succeed on this portion of his claim.  Nonetheless, the same basic sentiment underlying this payout dispute underlies Paparo's Fast Facts flyer contentions.  Paparo asserts, in essence, that all of Defendants' untoward treatment of Paparo (<u>i.e.</u>, both the personal attacks and denial of benefits) flow from the amalgamation of Paparo's pre- and intra-suit allegations of racism.  And from that perspective, it is simply best left to a jury decide which portions, if any, of Defendants' post-filing actions were retaliation for Paparo's suit.

---

[15] That said, the aforementioned February 21, 2022 letter from Paparo's counsel to the Borough expressly notified Individual Defendants of his "intent to file a civil lawsuit against the Borough and the four members of Council who voted to fire him."  ECF 55-2, Ex. 32.

5.  <u>Defamation and False Light (Counts VI and VII)</u>

This Court has already addressed the potential defamatory nature of Individual Defendants' campaign against Paparo, so it will revisit the issue here only briefly in reference to Paparo's state law defamation and false light claims.[16]

### a.  *Defamatory Statements*

The crux of Individual Defendants' argument here is, once again, that "the 10 Fast Facts were truthful and they were published only in response to the fact that Plaintiff and his supporters on Council started claiming that he was being fired for racism."  ECF 47 at 27.  But, as already explained, a genuine dispute exists regarding whether Defendants' campaign was pretextual.

To be sure, Pennsylvania law does not require "perfect truth, so long as any inaccuracies do not render the substance and 'gist' of the statements untrue."  <u>Reuban v. CBS Broad., Inc.</u>, 170 A.3d 560, 565 (Pa. Super. 2017) (citations omitted).  And here, the Borough did in fact agree to a Consent Award during Paparo's tenure.  Yet, Individual Defendants' reliance on the mere occurrence of this award misconstrues the source of the potential falsity.  Paparo takes issue not with its existence, but instead with Individual Defendants' public assertion that he was fired solely because he "mismanaged overtime."  ECF 55-2, Ex. 25.  Indeed, as noted, the Fast Facts flyer expressly creates a zero-sum game, as it unequivocally proclaims that "race played <u>no role</u> <u>whatsoever</u>" in the Council's decision to fire Paparo.  ECF 55-2, Ex. 37 (emphasis added).  If,

---

[16] Under 42 Pa.C.S. § 8343, a plaintiff must establish the following seven elements in order to meet his burden of proving a defamation claim: (1) The defamatory character of the communication; (2) Its publication by the defendant; (3) Its application to the plaintiff; (4) The understanding by recipient of its defamatory meaning; (5) The understanding by the recipient of it as intended to be applied to the plaintiff; (6) Special harm resulting to the plaintiff from its publication; and (7) Abuse of a conditionally privileged occasion.  If the plaintiff has met the burden for those seven elements, a defendant must then show: (1) The truth of the defamatory communication; (2) The privileged character of the occasion on which it was published; or (3) The character of the subject matter of defamatory comment as a public concern.  <u>Id</u>.

however, a jury finds that to be inaccurate, it necessarily diminishes the truthfulness and weight of Individual Defendants' lone asserted reason for termination.

The Court reiterates that it is entirely possible dual motivations existed.  A reasonable juror could conclude, for instance, that Individual Defendants terminated Paparo both on account of his race and a belief that Paparo mismanaged the Borough's funds.  But that is simply not what Individual Defendants conveyed to the public.

The inherent tension behind these two plausible reasons highlights the potentially defamatory nature of Defendants' statements.  The more heavily race played a role in their decision-making, the less credible Individual Defendants' claims of mismanagement become.  In other words, whether Paparo truly violated the CBA is a distinct question from whether his conduct amounted to mismanagement, which is further distinct from the question of whether Defendants did not fully believe Paparo's conduct amounted to a "fire-able" offense yet conveyed a different message to the public.  Individual Defendants' campaign implicates all three questions, and a genuine dispute exists as to the veracity of Defendants' contemporaneous public statements for each one.

Simply put, to the extent Individual Defendants relied on pretextual claims of mismanagement to publicly bolster their termination decision, a jury could find those statements to be defamatory.

b.  *Actual Malice, Special Harms, and Abuse of Privilege*

Individual Defendants three remaining, passing arguments—related to actual malice, special harm, and abuse of privilege—are likewise without merit.  ECF 47 at 27-28.  First, Individual Defendants assert that because Paparo was a public figure, he must establish actual malice—defined as proof that a "statement was made with . . .  knowledge that it was false or with

reckless disregard of whether it was false or not." Id. at 27 (citing to New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)). Here too, however, the pretextual posture of this case clearly precludes summary judgment. If the jury decides that race played a role in Individual Defendants' decision to terminate Paparo, the Fast Facts flyer's express statements to the contrary necessarily satisfies the actual malice requirement.

Second, the record undoubtedly supports the possibility of "special harm"—defined as "the loss of something having economic or pecuniary value." Beverly Enterprises, Inc. v. Trump, 182 F.3d 183, 188 (3d Cir. 1999) (citations omitted). Significant evidence in record indicates that, as result of Individual Defendants' campaign against Paparo, he may have missed out on future job opportunities. See, e.g., ECF 55-2, Ex. 1 at 71-72.

Third, a genuine dispute exists as to whether Individual Defendants engaged in an "abuse of privilege" here. As the Third Circuit has explained, Pennsylvania recognizes two forms of such abuse—(1) where "an official report [fails] to be fair and accurate, as when the publisher overly embellishes the account," and (2) where the defamatory material is "published for the sole purpose of causing harm to the person defamed." Medico v. Time, Inc., 643 F.2d 134, 146 (3d Cir. 1981). On this record, a reasonable juror could conclude that either condition was satisfied. To the extent the jury finds that Individual Defendants pretextually bolstered Paparo's alleged mismanagement, that falls squarely within the first bucket. To the extent the jury distinctly and reasonably concludes that Individual Defendants launched their campaign to purposefully discredit Paparo's assertions of racial discrimination and his performance as Chief of Police, that would fall squarely within the second bucket. As such, summary judgment is also not appropriate on "abuse of privilege" grounds.[17]

---

[17] For the same reason, summary judgment is also not appropriate for Paparo's "false light" claim, as he raises a genuine dispute as to whether Defendants' campaign amounted to "discrete

### c. High Public Official Immunity

Individual Defendants separately argue that, even if their statements were defamatory, they are nonetheless entitled to "high public official quality immunity."  ECF 47 at 30.

As this Court has explained, Pennsylvania "exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers."  Paparo, 2022 WL 6184890, at *7 (citing to Smith v. Borough of Dunmore, 633 F.3d 176, 181 (3d Cir. 2011)).  Accordingly, Individual Defendants are protected from tort liability only if (1) they qualify as high public officials, and (2) the "allegedly actionable behavior was made in the course of their official duties."  Osiris Enters. v. Borough of Whitehall, 877 A.2d 560, 567 (Pa. Commw. Ct. 2005).  Paparo does not appear to dispute that Individual Defendants' roles as Councilmembers satisfies this first element, and so the parties' briefing focuses largely on the second.

In conducting the "official duties" inquiry, Pennsylvania courts typically rely on two factors: "(1) the formality of the forum in which the words were spoken or published; and (2) the relationship of the legitimate subject of governmental concern to the person seeking damages for the defamatory utterance."  Id. at 568.

Here, Individual Defendants argue the allegedly defamatory statements "were all made in the course of the Council meeting and in the course of the official duties of the Council members."  ECF 47 at 30.  Paparo counters with McKibben v. Schmotzer, 700 A.2d 484 (Pa. Super. Ct. 1997) and Graham v. Avella Area Sch. Dist., 2006 WL 1669881 (W.D. Pa. June 14, 2006), which

---

presentations of information in a fashion which rendered the publications susceptible to inferences casting (appellate) in a false light . . . ."  Dunlap v. Philadelphia Newspapers, Inc., 448 A.2d 6, 15 (1982).

distinguish between criticisms made by public officials before and after those officials have authority over the target of their criticism, shielding officials only as long as that authority lasts. ECF 55-4 at 37-38.

In McKibben, for instance, the Superior Court of Pennsylvania confronted two distinct instances of potentially defamatory public facing statements made by a borough mayor against its chief of police, both related to the chief's alleged physical assault of the mayor. 700 A.2d at 487-88. Initially, the Superior Court concluded the mayor was "engaged in the course of her duties and within the scope of her authority when she suspended [the chief] and issued a 'News Release' regarding his suspension," despite that release being "harsh and, as the jury found, untrue." Id. at 490-491. Conversely, however, the McKibben Court declined to apply immunity to the mayor's later defamatory public statements regarding the police chief's testimony in a separate private criminal complaint, which occurred well after the borough council had reinstated the police chief. Id. The Court concluded the mayor's later "slanderous comments following the preliminary hearing [were] not closely related to her official duties in this case, but rather [were] merely those of a private citizen who was dissatisfied with the outcome" of the private suit. Id.

Likewise, in Graham, the Western District of Pennsylvania declined to apply high public official immunity to a schoolboard member who "[allegedly] falsely accused [plaintiff-teacher] of having an illicit sexual affair with a former principal" where "the defamation continued long after Plaintiff's last day of work." 2006 WL 1669881, at *5.

By contrast, in Matta v. Burton, the Commonwealth Court found a school board director immune from suit where she published a letter in a local newspaper criticizing the school district's business manager and accused him of misconduct related to a $13.5 million school renovation project. 721 A.2d 1164, 1165 (Pa.Cmwlth.1998), appeal dismissed, 558 Pa. 612, (1999). There,

the Court reasoned—in view of the director's "authority to oversee school district contracts"—that "her criticism of the business manager's handling of the contract fell within the scope of her duties and authority."  Id. at 1167.  As the Matta Court saw it, the director's public criticisms "did not comment on a matter affecting only her individual rights as a private citizen, but rather was attempting to inform the general public of what she perceived to be the mismanagement of a large public contract."  Id.

This case falls somewhere in between Matta on the one hand, and McKibben and Graham on the other.  While Individual Defendants' campaign against Paparo "continued long after [his] last day of work," Graham, 2006 WL 1669881 at *5, budget management was also plainly within the Council's purview.  In other words, the closer in time Individual Defendants' messaging was to their termination of Paparo, the more heavily that messaging mirrors the initial press releases in Matta and McKibben.  As time progressed, however, Defendants' pervasive and continuous campaign became increasingly disconnected from these initial, official public statements.

A reasonable juror might therefore find that—at some point along this continuum—Individual Defendants' messaging changed from merely informing the public to protecting their personal reputations, thus ceasing to be a part of Individual Defendants' official duties.  Given the factual, subjective nature of that inquiry, the Court concludes a jury must decide this cut off point, to the extent one exists.  On this record, it is ultimately for the factfinder to determine whether Individual Defendants' efforts throughout the entirety of this campaign were "closely related" to their "legitimate duties," or instead those of "private citizen[s] who [were] dissatisfied with" the accusation leveled against them personally.  McKibben, 700 A.2d at 492.[18]

---

[18] Individual Defendants separately argue they are entitled to qualified immunity for Paparo's constitutional claims at Counts II-V because "it cannot be said that any one of the four individual Defendants acted unreasonably vis a vis any of the four federal claims asserted by the Plaintiff."

6.  <u>WPCL (Count VIII)</u>

Individual Defendants lastly move for summary judgment on Paparo's claim under the WPCL, again incorporating the Borough's arguments by reference.  ECF 47 at 31.  Each of Individual Defendants' additional arguments fall short.

First, at oral argument, Individual Defendants asserted that—even if the WPCL applies to municipalities—each Individual Defendant does not fall within the definition of "employer" for the purposes of the Act.  But relevant precedent dictates precisely the opposite conclusion.  <u>See</u> <u>Faden v. deVitry</u>, 425 Pa. Super. 555, 560-61 (1993) ("By statutory definition, 'employer' includes any agent or officer of a corporation. . . . Therefore, no error was committed in holding [agent] individually liable under the WPCL."); <u>Amalgamated Cotton Garment & Allied Indus. Fund v.</u> <u>Dion</u>, 341 Pa. Super. 12, 16 (1985).  Further undermining this argument, Individual Defendants ignore that Paparo's contention here is that Individual Defendants—constituting a majority of the Council—were acting in unison and on behalf of the Borough both pre- and post-termination, thus serving as Paparo's de facto employer in this broader regard.

Second, Defendants argue that because Paparo's section 1981 and Due Process claims must fail, so too must his "derivative claim for 'nonpayment' of wages and other employment benefits." ECF 48 at 46-47; ECF 47 at 31.  Even if this Court were to accept this premise regarding the "derivative" nature of Paparo's claim, the Court has already rejected Defendants' section 1981 and Due Process arguments.  Accordingly, this second contention is also unavailing.

---

ECF 47 at 37. But, as Paparo rightly argues, the right to be free from racial discrimination "has been clearly embedded in Supreme Court precedent" for decades.  ECF 55-4 at 45 (citing to <u>Griffin</u> <u>v. Breckenridge</u>, 403 U.S. 888, 101-102 (1971)).  As a genuine dispute exists regarding that discrimination for each Individual Defendant, qualified immunity for Paparo's constitutional claims is inappropriate here.

Third, Defendants assert that Paparo cannot satisfy section 10 of the WPCL, which requires an employee to show "no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such nonpayment."  ECF 48 at 47 (citing 43 P.S. § 260.10); ECF 47 at 31.  Again, Defendants' argument hinges on Paparo's inability to "establish a claim for wrongful termination under § 1981, [or] a due process violation." Id.  Assuming without the deciding the applicability of this section of the WPCL, this argument fails for the same reason Paparo's "derivative" claim contention fails.

Fourth, Defendants argue that Pennsylvania's Political Subdivision Tort Claims Act renders Defendants immune from suit under the WPCL.  ECF 48 at 38 (citing to 42 Pa. C.S. § 8541); ECF 47 at 31.  As Paparo correctly counters, however, the WPCL does not provide for tort relief.  ECF 55-4 at 43-44.  Instead, it is a statutory vehicle for a former employee "to enforce payment of wages and compensation to which" he may be "otherwise entitled by the terms of an agreement."  Id. at 44 (citing to Toppy v. Passage Bio, Inc., 285 A.3d 672, 689 (Pa. Super. 2022)); see also Hunt v. Custom Cable Indus., Inc., 2011 WL 2200065, at *4 (E.D. Pa. June 7, 2011) (noting a lack of "authority that suggests that violations of the WPCL are torts").

Finally, as to the actual number of hours owed, Defendants argue the CBA precludes Paparo, as Chief of Police, from the 776 hours of severance pay to which he claims he is entitled.  ECF 47 at 6.  Defendants rely primarily on an affidavit from Thomas Reynolds, who contends that, under the CBA

1. A police chief is not entitled to compensatory time unless specifically defined in his/her Employment Agreement. Compensatory time is received in lieu of overtime and as a salary employee, a police chief s not entitled to overtime.

2. Under the Collective Bargaining Agreement, when an office leaves for any reason other than a normal or disability retirement, they do not get compensated for unused sick time or unused vacation time. Any deviation would have to be based on upon contractual terms that are not included in the Collective Bargaining agreement.

ECF 47-6, Ex. EE (emphasis added).  Paparo replies that (i) his employment agreement; (ii) the 2014-2017 CBA; and (iii) the 2018-2022 CBA, in combination, make clear that he is entitled to the hours he claims.  ECF 58-4 at 25-26; ECF 55-4 at 1.

In so doing, Paparo breaks his calculation into three components: vacation, compensation, and sick days.  On vacation, Paparo relies on language in his employment agreement expressly providing for the following: (1) "[v]acation and personal holiday leave shall follow the guidelines of the Police Collective Bargain Agreement in effect"; (2) "Paparo shall be permitted to carry over up to ten (10) days of unused vacation days into the following year"; and (3) "Paparo is recognized, as of the date of hire, to be entitled to maximum annual paid vacation allowance of 200 hours, currently in effect."  ECF 55-2, Ex. 35.  He likewise notes the 2018-22 CBA then amended this latter maximum to 240 hours.  Id.  Thus, Paparo calculates that, as of January 1, 2022, he had accrued 320 hours of vacation—the sum of his 240-hour cap and his 80 hour (i.e., 10 day) carry over as authorized by agreement.  Id.

On compensation pay, Paparo similarly notes his agreement states that "it is the intent of the Borough to provide Paparo with all of the benefits provided to police officers pursuant to the Police Collective Bargaining Agreement," and that the CBA states "[o]fficers may accrue compensatory time to a maximum of one hundred twenty (120) hours."  Id.

On sick leave, Paparo's agreement again provides that he "shall be entitled to receive sick leave … in accordance with the Police Collective Bargaining Agreement," which in turn states "each full time officer shall have an annual allotment of 12 sick days (96 sick hours), which shall be added to the carry-over sick days from the prior year. An officer shall be permitted to carry-over not more than 30 unused sick days (240 hours) into each subsequent year."  Id.  Paparo also

notes the CBA further states that "up to 42 unused sick days (336) hours shall be paid to the officer at the time of retirement."  Id.

The parties, to some degree, are arguing past each other here.  Paparo leans heavily into the hours accrued provisions, whereas Individual Defendants rely on their assertion that payout for most, if not all, claimed hours applies only where a police officer retires.  Most notably, section 28 of the 2017 CBA, entitled "termination of the Department," states that "[u]pon the termination of the Department each officer shall receive two (2) weeks pay in addition to any severance pay to which the officer would otherwise be entitled."  ECF 55-2, Ex. 30 (emphasis added).  Likewise, not every category of accrued time within the CBA expressly references a payout, regardless of whether an employee is terminated or retires.  Id.  The vacation section of the CBA, for instance, references an employee's right to compel the Borough to buy back forty hours of vacation annually, but says nothing of a termination payout.  Id.  Further, Paparo's agreement expressly states that "[u]nused vacation days may accrue for early retirement purposes only" and that this "accrual shall not be used for lump sum payment at retirement."  ECF 55-2, Ex. 29.  That would appear to indicate, unless Paparo's termination constituted "early retirement," he is not entitled to such unpaid vacation days.  That said, the next sentence then carves out the "early retirement incentive program" for situations "authorized by Council which does not provide sufficient time for usage of accrued vacation days," id., which, in theory, could swing this dispute back in Paparo's favor.

In short, while Paparo appears to be entitled to some sort of payout under his agreement and the relevant CBAs, it is entirely possible the proper amount is somewhere between his claimed 776 hours and Defendants' asserted cap of 160 hours.  Further, in this Court's view, there are multiple reasonable readings of these agreements that might lead to different payouts, thus

rendering the connection between Paparo's employment agreement and the various CBA provisions ambiguous.  As such, a jury must decide the proper scope of these agreements.  See, e.g., Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir. 1999) ("If the contract as a whole is susceptible to more than one reading, the factfinder resolves the matter") (citations omitted).

Accordingly, Individual Defendants' arguments do not warrant summary judgment on Paparo's final WPCL claim.  Thus, this Court will **DENY** Individual Defendants' motion in full.

### C. Paparo's Cross-Motion

Paparo separately moves for partial summary judgment on specific portions of his retaliation claim.  ECF 46.  First, Paparo argues that no genuine dispute of fact exists for Paparo's assertion that Defendants have refused to pay him "any of the hours he was contractually entitled for vacation, compensation time, and sick leave."  ECF 46-7 at 1.  Second, Paparo contends Defendants have indisputably damaged his reputation and impeded his ability to obtain another job as a result of their distribution of the Fast Facts flyer.  Id.  Yet, for the same reasons Defendants' motions for summary judgment must be denied, so too must Paparo's.

First, while Defendants concede they have yet to pay Paparo post-employment wages or benefits apart from returning his own pension contributions, a genuine dispute remains as to the proper number of hours to which Paparo is entitled.  As noted above, the terms of Paparo's employment agreement, in combination with the relevant CBAs, are ambiguous, making summary judgment inappropriate.

Paparo attempts to reframe the inquiry, arguing that the exact hour count is merely a question of damages, rather than one of liability.  ECF 61 at 3.  But this framing ignores that non-payment alone is insufficient to establish liability.  Most notably, a jury must still parse the "causal connection" between Paparo's suit and Defendants' refusal to pay, for which a genuine dispute of

fact remains.  Moreover, Paparo appears to blur the line between hours owed and actual resulting monetary damages.  The former is ultimately a question of contract interpretation, and this Court has already determined the relevant contractual provisions are sufficiently ambiguous to reach a jury.  Otherwise stated, the Court cannot assume retaliatory liability for Defendants' refusal to pay out hours when a jury could conclude Defendants were not liable for some (or all) of the hours in the first place.[19]

If anything, granting summary judgment on the narrow fact that Defendants have yet to pay any out benefits might confuse the jury on this very distinction.  Thus, to the extent Defendants agree they have not yet paid out any benefits, it would seem a stipulation of fact is appropriate, rather than a grant of summary judgment.  See, e.g., Martin v. City of Reading, 118 F. Supp. 3d 751, 782-83 (E.D. Pa. 2015); SEC v. Thrasher, 152 F.Supp.2d 291, 297 (S.D.N.Y.2001) (observing that Rule 56, which permits the Court to resolve certain factual disputes after passing on, and declining to grant, a request for summary judgment, "does not allow a party to bring a motion for a mere factual adjudication").

Second, Paparo is also undoubtedly correct that significant evidence in the record indicates the Fast Facts flyer was "to the detriment of [Paparo's] employment opportunities." Charlton, 25 F.3d at 201.  Recall, however, Defendants counter that the contents were entirely accurate and "not retaliation for any lawsuit," but instead "in rebuttal to the various claims of racism that were being put forth in the press." ECF 47 at 25.  So, again, even if there is little dispute amongst the parties

---

[19]  At oral argument on January 26, 2024, Counsel for Paparo asserted that Defendants do not contest that Paparo is entitled to at least 160 hours of pay, and further that the WPCL requires the immediate payout of such undisputed claims.  See also ECF 61 at 3 n.1 (citing to 43 Pa.C.S.A. § 260.5).  To the extent any such concession occurred, it appears to have been in the context of settlement negotiations.  See Fed. R. Evid. 408; Cf W. Palm Beach Hotel, LLC v. Atlanta Underground, LLC, 626 F. App'x 37, 43 n.5 (3d Cir. 2015).  Even if that is not correct, however, the record does not clearly reflect that Defendants have so conceded, and so this Court believes it is best left to the jury to decide the proper hours due under the relevant agreements.

as to the binary issue of whether Paparo's reputation was harmed as a result of this Fast Facts flyer, the causal connection between Paparo's suit and the Fast Facts flyer remains at issue.  And if the jury accepts the Fast Facts flyer as entirely accurate, it becomes less clear whether the dissemination was sufficiently adverse for the purposes of a retaliation claim.  In the same way truth serves as a defense to defamation, it could do the same for Paparo's retaliation claim here.  Otherwise stated, retaliation claims are not meant to enable bad actors to shift the consequence of their misconduct to a third-party who publicizes that misconduct.  Framed in terms of Paparo's current summary judgment motion, if the Fast Facts flyer is entirely accurate, a genuine dispute of fact remains as to whether any diminished employment opportunities flowed from Paparo's alleged mismanagement of funds, or instead from the Council's extensive efforts to highlight that alleged mismanagement to combat Paparo's claims of racism.  Thus, here too, summary judgment is inappropriate. Accordingly, Paparo's motion is **DENIED**.

## V.       CONCLUSION

For the foregoing reasons, both the Borough's and Individual Defendants' motions for summary judgment are **DENIED**.  Further, Paparo's motion for partial summary judgment is also **DENIED**.  The following claims are preserved for trial:

- **Count I** against the Borough;

- **Count II** against Individual Defendants;

- **Count III** against Individual Defendants;

- **Count IV** against all Defendants;

- **Count V** against all Defendants;

- **Count VI** against Individual Defendants;

- **Count VII** against Individual Defendants;

- **Count VIII** against all Defendants.

An appropriate order follows.

O:\CIVIL 22\22-841 Paparo v. Borough of Yeadon et al\22-841 - Paparo MSJ Memorandum.docx